# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

Amy Stevens,
Jane Doe 1,
and Jane Does 3-50,
on behalf of themselves and
all others similarly situated,

                                      Case No. 1:18-cv-3015

        Plaintiffs,

vs.                                    Related Case No. 1:18-cv-2113-WTL-MJD

USA Diving, Inc.,
Indiana Diving Association of USA Diving, Inc.,
Indiana Diving Academy, Inc., d/b/a Ripfest,
John Wingfield, and
Johel Ramirez Suarez,

        Defendants.

_____

## CLASS ACTION COMPLAINT AND JURY DEMAND

_____

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. ii

NATURE OF THE COMPLAINT ................................................................................. 1

PARTIES ....................................................................................................................... 6

    The Plaintiffs ........................................................................................................... 6

    The Defendants ....................................................................................................... 6

JURISDICTION ............................................................................................................ 8

FACTS COMMON TO ALL COUNTS ......................................................................... 8

    Overview of the Sports Act, the USOC, and its NGBs, Clubs, and Coaches .................... 8

    USA Diving: The Commercial Quest for "Medals and Money" Off the
    Labor of Athletes ................................................................................................... 13

    Congress Is Forced to Step In: The Sports Abuse Act 2017 ............................... 26

PLAINTIFF-SPECIFIC ALLEGATIONS .................................................................. 29

CLASS ACTION ALLEGATIONS ............................................................................. 34

    (b)(2) Injunction Class ........................................................................................ 35

    (b)(3) and/or (c)(4) Damage Class ..................................................................... 35

CLAIMS FOR RELIEF ............................................................................................... 37

DEMAND FOR JURY TRIAL ................................................................................... 54

PRAYER FOR RELIEF .............................................................................................. 55

**NATURE OF THE COMPLAINT**

1.      This class action involves sexual abuse, exploitation, and the forced labor of USA Diving members by the Team USA coaches, entities, officials, and executives who were entrusted to protect them.

2.      Rather than upholding the values and spirit of Team USA, these bad actors manipulated the trust placed in them, abused the power and legitimacy bestowed upon them, shattered the innocence and dreams of numerous female athletes, and violated multiple federal and state laws in the process.

3.      The United States Olympic Committee ("USOC") and its National Governing Body ("NGB") for diving, USA Diving, have reached for commercial success at all costs by ignoring, denying, obstructing, or covering up complaints of sexual abuse, deferring and diverting investigations, and suppressing all questions about sexual exploitation by its coaches.

4.      The leaders of Team USA, including those who run the USOC and USA Diving, tolerate and often facilitate the sexual abuse of children by coaches and other adults.[1]

5.      With hundreds of millions of dollars on its balance sheet (all of it earned off the backs and labor of Team USA's athletes), the USOC and its NGBs (including USA Diving) could have long ago stopped and helped prevent much of this sexual misconduct, which has been rampant in USA Diving and other sports for decades.

---

[1] Will Hobson, *Victims Say the USOC Deserves Blame for America's Olympic Sex Abuse Problem*, WASH. POST (Feb. 23, 2018), https://www.washingtonpost.com/sports/olympics/victims-say-the-usoc-deserves-blame-for-americas-olympic-sex-abuse-problem/2018/02/23/b5afe70a-1270-11e8-9065-e55346f6de81_story.html?noredirect=on&utm_term=.303109b367f2.

6.     Because of the USOC's complete failure to regulate its NGBs or stop the widespread sexual abuse of Team USA's athletes, Congress stepped in and enacted the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017 ("The 2017 Sports Abuse Act").

7.     This legislation took effect in February 2018 and was passed in direct response to "allegations of sexual abuse made against personnel involved with USA Gymnastics, USA Swimming, and USA Taekwondo and follows hearings [in 2017] before the Senate Judiciary Committee and the Senate Commerce Committee on athlete safety issues."[2]

8.     Architected by Senators Dianne Feinstein (D-Calif.) and Susan Collins (R-Maine), the 2017 Sports Abuse Act was introduced with the broad support of "Republican and Democratic members from both the House and the Senate, and four former Olympic gymnasts."[3]

9.     In testimony on the floor of the Senate, Senator Feinstein emphasized that the 2017 Sports Abuse Act "strengthens the law that allows victims of sex abuse to file suits against those who abused them to commit crimes such as sex trafficking" and that punitive damages are now expressly provided by statute "due to the heinous nature of the crimes."[4]

---

[2] Senator Susan Collins, *At Press Conference with Former Olympic Gymnasts, Senator Collins Urges Colleagues to Support Legislation She Introduced with Senator Feinstein to Protect Athletes from Sexual Abuse*, COLLINS.SENATE.GOV (Jan. 30, 2018), https://www.collins.senate.gov/newsroom/press-conference-former-olympic-gymnasts-senator-collins-urges-colleagues-support

[3] *Id.*

[4] Testimony of Sen. Feinstein, 164 CONG. REC. S589-02, 2018 WL 636521 (Jan. 30, 2018).

10.    Senator Feinstein further condemned the USOC's and the NGBs' commercial obsession with "medals and money"—which are pursued over the safety and wellbeing of America's young athletes:

> One of the common themes I heard from their stories was not just the predatory behavior of the perpetrators, but also how the USA Gymnastics institution failed to protect them. One of the women told me how she heard USA Gymnastics officials say at one point that it was their top priority to obtain "**medals and money**" and that a "reputation of a coach" should not be tarnished by an allegation raised by a victim.[5]

11.    This Congressional action sought to remedy decades of flagrant and knowing sexual abuse at the highest levels of Team USA, across nearly all of the 47 different Olympic sports.

12.    Since 1982, more than 290 coaches and officials associated with the USOC sports organizations have been publicly accused of sexual misconduct, according to a *Washington Post* review of sport governing body banned lists, news clips, and court records in several states. The figure spans participants in 15 sports and amounts to an average of eight adults connected to an Olympic organization accused of sexual misconduct every year — or about an act of sexual abuse once every six weeks — for more than 36 years.[6] And for every one of these perpetrator coaches, there are an untold number of victims left to suffer in the shadows.[7]

13.    Diving is one of 47 Olympic sports, which range from archery to wrestling.

---

[5] Testimony of Sen. Feinstein, 163 Cong. Rec. S1634-01, 2017 WL 900895 (Mar. 7, 2017) (emphasis added).

[6] Will Hobson & Steven Rich, *Every Six Weeks for More than 36 Years: When Will Sex Abuse in Olympic Sports End?*, Wash. Post (Nov. 17, 2017), https://www.washingtonpost.com/sports/every-six-weeks-for-more-than-36-years-when-will-sex-abuse-in-olympic-sports-end/2017/11/17/286ae804-c88d-11e7-8321-481fd63f174d_story.html?utm_term=.24ca96bb8af3

[7] USA Gymnastics team doctor Larry Nassar's known victims alone now total at least 265. *See* Leonard Greene & Jessica Schladebeck, *Judge Says 265 Have Come Forward with Sexual Assault Allegations Against Larry Nasser*, N.Y. Daily News (Jan. 31, 2018), http://www.nydailynews.com/news/national/judge-265-larry-nassar-victims-article-1.3790363

14.     Any young diving athlete in the United States who wants to compete in the Olympics as a diver has only one route to get there: he or she must be selected by USA Diving and be named part of the US Olympic diving team.

15.     The coaches and executives who select the diving team, therefore, possess an inordinate amount of power.

16.     This power structure creates a monopoly-like situation that exposes young, vulnerable, athletes to a very dangerous dynamic in which they are forced to do anything their coaches say.

17.     Perception is reality, and it is never clear to these athletes which coach actually controls their fate.

18.     But they do know that if they do not obey their coaches, they might not make the team—even if they are more qualified or have better scores than their competitors.

19.     As a result, all USA Diving coaches and officials have an exceptional amount of power to exploit the labor of the athletes who compete to be named to Team USA—in diving, and in every other sport.

20.     When young athletes do report sexual abuse to adults and Team USA's employees, coaches, and officials, they are often met with obstruction, denials, and cover-ups by their coaches, by USA Diving, and by the clubs that are credentialed and regulated by USA Diving.

21.     This teaches young athletes that their complaints and reports of sexual abuse are unimportant; the athletes are merely fungible commodities that can be trained and transported to competitions for the sexual gratification and commercial benefit of their coaches and other employees and executives.

22.     The toxic Olympic sports culture, including inside USA Diving, emboldens adult coaches to continue and proliferate their sexual exploitation without any fear of prosecution or financial penalty, which causes the toxic culture to metastasize.

23.     The combined result is a feedback loop of sexual abuse, exploitation, and forced labor of America's young athletes, all so that the officials leading the USOC and its NGBs can feed the U.S. Olympics machine, which runs on "medals and money."

24.     Anything or anyone that gets in the way of this commercial quest for "medals and money" is silenced, obstructed, defamed, or intimidated into keeping quiet.

25.     This lawsuit focuses on USA Diving, but most of the other NGBs (for the 46 other Olympic sports) are rife with the same systemic sexual abuse of young athletes.

26.     Fortunately, Congress created not only the USOC, but also a long list of federal statutes (including the 2017 Sports Abuse Act) with austere civil remedy provisions specifically crafted to punish and deter the very criminal conduct that was knowingly committed in this case.

27.     Through this lawsuit, Plaintiffs shine a light on USA Diving, its clubs (like Ripfest), and predator coaches (like Johel Ramirez Suarez). Plaintiffs, on behalf of themselves and the Class, declare that enough is enough, that no other female athletes should have to endure the "disgusting and unnecessary"[8] exploitation, abuse, and forced labor they have experienced at the hands of the USA Diving rapists who stood at the apex—and served as the gatekeepers—of their diving dreams.

---

[8] Quoting Michaela Maroney's tweet from October 2017 under hashtag #MeToo. Tom Schad, *Lawsuit Claims USA Gymnastics Paid to Quiet Olympic Gold Medalist McKayla Maroney,* USA TODAY (Dec. 20, 2017), https://www.usatoday.com/story/sports/olympics/2017/12/20/lawsuit-usa-gymnastics-paid-quiet-olympic-gold-medalist-mckayla-maroney/969843001/.

## PARTIES

### The Plaintiffs

28.     Plaintiff Amy Stevens is an individual currently residing in Michigan.

29.     Plaintiff Jane Doe 1 is an individual currently residing in Florida.

### The Defendants

#### *Defendant USA Diving*

30.     The Ted Stevens Amateur Sports Act ("The Sports Act") gives the USOC the express authority to authorize National Governing Bodies ("NGBs") in all Olympic Sports.

31.     Defendant USA Diving ("USA Diving") is the USOC-recognized and USOC-regulated NGB for the sport of diving.

32.     USA Diving was at all times herein mentioned, and still is, an Ohio corporation with its principal place of business in the city of Indianapolis, Indiana.

33.     USA Diving may be served through its registered agent, Linda Paul, at 1060 North Capitol Avenue, Suite E-310, Indianapolis, Indiana 46204.

#### *Defendant Ripfest*

34.     Defendant Indiana Diving Academy, Inc., which does business as Ripfest ("Ripfest") is an Indiana corporation doing business in Indiana.

35.     Ripfest operates a residential diving program at 108 Olive Street, Arcadia, Indiana 46030.

36.     It can be served through its registered agent and president, John Wingfield, at 12728 Portage Way, Fishers, Indiana 46038.

### Defendant Indiana Diving Association

37.     Defendant Indiana Diving Association of USA Diving, Inc., ("IDA") is the Indiana arm of United State Diving.

38.     USA Diving has dozens of local diving associations across the United States.

39.     Indiana Diving is the local association of United States Diving in Indiana.

40.     IDA can be served at 54161 Westwood Drive, Elkhart, Indiana 46514

### Defendant John Wingfield

41.     John Wingfield is the President of Ripfest residential diving facility.

42.     John Wingfield has been an agent, servant, or employee of USA Diving since 1998.

43.     John Wingfield opened the first USA Diving National Training Center.

44.     In 2009, John Wingfield became the head coach of USA Diving.

45.     John Wingfield was the official head coach of the 2008 Olympic USA Diving team.

46.     John Wingfield is a four-time United States Olympic Committee Coach of the Year for diving.

47.     John Wingfield was also named the United States Olympic Committee Developmental Coach of the year for all Olympic Sports in 2009.

48.     At all relevant times, Defendant Wingfield and Defendant Ripfest operated a residential diving program.

49.     John Wingfield can be served at 12728 Portage Way, Fishers, Indiana 46038.

### Defendant Johel Ramirez Suarez

50.     Defendant Johel Ramirez Suarez is a citizen of Venezuela who is legally present and employed in Indiana.

51.     Suarez may be served through counsel, Stephen Neal Ziliak, 44 North 9th Street, Suite 206, Noblesville, Indiana 46060.

## JURISDICTION

52.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims alleged.

53.     This Court also sits in diversity jurisdiction as all Plaintiffs are diverse from all Defendants.

54.     Venue is appropriate in this district because Defendants USA Diving, the Indiana Diving Association, and Ripfest have their corporate headquarters in this district, Defendants Wingfield and Johel Ramirez Suarez  are residents of this district and all of the relevant events occurred here.

## FACTS COMMON TO ALL COUNTS

### Overview of the Sports Act, the USOC, and its NGBs, clubs, and coaches

55.     Congress originally chartered the United States Olympic Association in 1950 to organize and promote the United States' participation in international Olympic competition. This spun into the United States Olympic Committee (the "USOC") in 1964.

56.     In 1978, concerned with "the disorganization and the serious factional disputes that seemed to plague amateur sports in the United States," Congress enacted the Ted Stevens Olympic and Amateur Sports Act ("the Sports Act"), P.L. 95–606 (now codified at 36 U.S.C. § 220501, *et seq*.), to codify the purpose and powers of the USOC, and to create national governing bodies ("NGBs") for each Olympic sport.

57.    Thus, the Sports Act controls the USOC and all of its NGBs, who merely operate as extensions or agents of the USOC.[9]

58.    As of 2018, there are 47 NGBs (one for each Olympic sport).

59.    Under the Sports Act, the USOC has a duty to protect the young athletes who seek to compete in Olympic sports in the United States. The USOC is responsible for the conduct of its NGBs and is required by statute to make sure Team USA's athletes are kept safe from sexual predators. In fact, the USOC has publicly stated the same multiple times and has been forced to apologize for not upholding its promise and obligation to do so.

60.    The USOC is motivated by only two things: medals and money. Its sole goal is to win more sponsorships and more marketing deals so that its executives and Board Members can maintain their "country club" lifestyle, which includes lavish meals, first-class airfare, luxury hotels, bloated salaries and per diems, and the fame and fortune that come from being at the helm of Team USA. In reality, the USOC has decided to sacrifice the safety and welfare of its athletes for the trappings of fame and fortune that accrue to its executives.

61.    Sexual abuse allegations represent a threat to this steady stream of commercial success. For this reason, the USOC tries at every opportunity to keep the public from recognizing that the USOC is a complete sham. Rather than taking seriously its admitted duty to protect Team USA's athletes, its board members and executives are focused only on themselves and their personal fringe benefits.

62.    A review of the individual 990 forms of public nonprofits reveals that the USOC annually spends more on outside law firms—paying its politically connected law firms lavishly to

---

[9] Title 36 U.S. Code, chapter 2205 organizes and defines the USOC as a "federally chartered corporation." 36 U.S.C. §§ 220501(b)(6), 220502(a).

defend it in lawsuits and lobby Congress to stop any reforms that would jeopardize the fringe benefits of its 15 board members or the executives at the top who run the USOC—than it does on Safe Sport (the entity the USOC supposedly set up to keep athletes safe and investigate allegations of abuse).

63.     The stated purposes of the USOC include: to develop amateur athletic activity in the United States directly related to international amateur athletic competition;[10] to exercise "exclusive jurisdiction" over "all matters" pertaining to U.S. participation in the Olympic and Pan-American Games;[11] to "obtain for the United States…the most competent amateur representation possible in each event" of the games;[12] to provide "swift resolution of conflicts"; to "protect the opportunity of any amateur athlete, coach, trainer, manager, administrator, or official to participate in amateur athletic competition";[13] and, recently, "to promote a safe environment in sports that is free from abuse, including emotional, physical, and sexual abuse, of any amateur athlete."[14]

64.     In short, the USOC is responsible for the training, entering and funding of U.S. teams for the Olympic, Paralympic, Youth Olympic, Pan American and Para-Pan American Games, while serving as a steward of the Olympic Movement throughout the country. In other words, among the USOC's powers are to "organize, finance, and control the representation of the

---

[10] 36 U.S.C. § 220503(2).

[11] 36 U.S.C. § 220503(3).

[12] 36 U.S.C. § 220503(4).

[13] 36 U.S.C. § 220503(8).

[14] 36 U.S.C. § 220503(15), added Feb. 14, 2018 by PL115-126, 132 Stat. 318.

United States in the competitions and events" of, the Olympic, Paralympic, and Pan-American Games (the "Games").[15]

65.     The USOC accomplishes this by recognizing, for each of the various sports represented in the Games, one eligible amateur sports organization as an NGB for that sport, and the USOC provides substantial financial support to the NGBs.[16]

66.     Each NGB is charged with promoting competition in its respective sports.

67.     Each NGB is charged with selecting the athletes, officials, and coaches for its sport at the Pan Am Games, World Championships, World Cups, and Olympic Games.

68.     The Pan Am Games, World Championships, World Cups, and Olympic Games are "protected competitions" under the Sports Act.

69.     The USOC controls all aspects of every protected competition.

70.     Each NGB then submits its roster of proposed coaches and athletes for protected competitions to the USOC.

71.     The USOC then enters the athletes and coaches in the protected competitions.

72.     The Sports Act gives the USOC the power to control all of the NGBs.

73.     USA Diving is one of 47 NGBs recognized by the USOC under the Act that sponsors or arranges amateur athletic competition.[17]

74.     The Sports Act gives the USOC the power to enforce compliance by the NGBs with all requirements of the Sports Act.

---

[15] 36 U.S.C. § 220505(c)(3).

[16] 36 U.S.C. §§ 220505(c)(4), (6).

[17] 36 U.S.C. §§ 220501(b)(3), (8).

75.     Such power includes the power to put NGBs on probation, to replace the entire board of any NGB, or to de-certify an NGB.

76.     The Sports Act allows the USOC to force NGBs to adopt policies and procedures to ensure the physical safety of athletes.

77.     For example, in 1999, the USOC required all NGBs to purchase insurance to specifically cover the sexual assaults of any minor.

78.     If NGBs did not purchase sexual abuse insurance, their members would not be permitted to use the USOC training facilities in Chula Vista, California; Lake Placid, New York; Marquette, Michigan; or Colorado Springs, Colorado.

79.     In 2010, the USOC created a task force to make recommendations to address the issue of child sexual assault in USOC controlled sports.

80.     In September 2012, that task force presented its recommendation to the USOC Board of Directors.

81.     The USOC Board took no action on those recommendations for almost two years.

82.     Finally, the USOC adopted a Safe Sport Handbook in 2012, which set forth a minimum standards policy.

83.     In 2013, the USOC required each NGB to adopt an athlete safety program by December 31, 2013.[18]

84.     The USOC took no action to ensure that its NGBs, including USA Diving, actually adopted such a program.

---

[18] U.S. House Comm. on Energy & Commerce, *Memorandum re Hearing entitled "Examining the Olympic Community's Ability to Protect Athlete's from Sexual Abuse,"* (May 21, 2018), https://docs.house.gov/meetings/IF/IF02/20180523/108356/HHRG-115-IF02-20180523-SD002.pdf.

85.     USA Diving did not timely adopt all the required elements of the USOC's required Safe Sport program.

86.     The USOC took no action against USA Diving for failing to timely adopt a compliant Safe Sport program.

87.     By 2014, the USOC knew that sexual abuse of children was widespread in the U.S. Olympic Sports Movement.

88.     The USOC is fully aware of the pervasive amount of child rape in its member NGBs.

89.     The USOC is the final authority in U.S. Olympic Sport.

90.     Other than the USOC, USA Diving has complete and final control over the sport of diving in the United States.

**USA Diving: The Commercial Quest for "Medals and Money" Off the Labor of Athletes**

91.     Although the USOC and the NGBs are restricted by statute from engaging in business for profit,[19] and although USOC receives no permanent funding from the Federal government, the Olympics—and the competitive amateur sports industry that feeds into it—is big business.

92.     Olympic-hopeful athletes and coaches are involved in a commercial endeavor infused with money, contracts, and terms. Every participant (athletes, coaches, USA Diving, and the United States Olympic Committee) is a commercial actor.

---

[19] 36 U.S.C. 220507(a).

93.    Each Olympic athlete has a direct commercial relationship with the USOC, which imposes a list of "commercial terms"[20] upon each athlete as a precondition for participating:



94.    The commercial relationship between the NGB and each athlete is further confirmed on the USOC's website, which states that the USOC "supports U.S. Olympic …athletes on and off the field of play through programming such as direct athlete funding, health insurance, tuition grants, media and marketing opportunities, career services and performance-based monetary rewards."[21]

---

[20] *Commercial Terms*, TEAMUSA.ORG, https://www.teamusa.org/Athlete-Resources/Athlete-Ombudsman/Commercial-Terms.

[21] *About the USOC*, TEAMUSA.ORG, https://www.teamusa.org/About-the-USOC

95.     Although this commercial relationship benefits the athletes, the national governing bodies, and the USOC, the commercial benefits that flow to the USOC are disproportionately larger.

96.     In 2016 alone, the USOC generated $339 million in unconsolidated revenue.[22]

97.     The USOC generates billions of dollars in licenses and sponsorships because it controls all aspects of and for the NGBs.

98.     The USOC provides financial support to USA Diving.

99.     According to its 2016 tax returns, over $1,600,000 of USA Diving's nearly $2,000,000 budget came from "grants."

100.    The USOC is believed to be the largest source of these "grants."

101.    USA Diving is completely dependent on the USOC's financial support.

102.    According to Team USA's website, in May 2014, NBC Sports signed a deal worth $7.75 billion to broadcast the Olympic games through 2032.[23]

103.    Larry Probst, the USOC Chairperson, described this as a "terrific deal" and NBC Sports Chairperson Mark Lazarus explained, "The Games are very important pieces of real estate."[24]

104.    The corporate sponsorships of Team USA generate hundreds of millions of dollars of additional revenue off the backs of the athletes who wear Team USA uniforms.[25]

---

[22] UNITED STATES OLYMPIC COMMITTEE 2016 ANNUAL REPORT 41 (2016), http://2016annualreport.teamusa.org/USOC_32554_AR16.pdf. Funding sources include Broadcast rights ($169M); Marks rights ($194M); Licensing Royalties ($21M); Contributions ($98M) and Other ($112M).

[23] Amy Rosewater, *NBC, IOC Ink $7.75 Billion Deal for Games*, TEAMUSA.ORG (MAY 7, 2014), https://www.teamusa.org/News/2014/May/07/NBC-IOC-Ink-775-Billion-Deal-For-Games.

[24] *Id.*

[25] *Sponsors*, TEAMUSA.ORG, https://www.teamusa.org/sponsors (last visited May 2, 2018).

105.    Without Team USA's athletes (including divers) competing, the USOC would not earn any revenue, would not have any television deals with NBC, would not have any endorsements, and would not have any sponsors.

106.    The USOC itself states this on its website,[26] noting that it "does not receive federal financial support" and that it "generat[es] revenue" by "licenses" to sponsors:



107.    Despite having hundreds of millions of dollars to spend on the safety and wellbeing of the athletes whose labor earned this money, the USOC and USA Diving (along with the other

---

[26] *Inside the USOC*, TEAMUSA.ORG, https://www.teamusa.org/about-the-usoc/inside-the-usoc (last visited May 2, 2018).

NGBs controlled by the USOC) decided over the last two decades to not pay for reasonable compliance or security measures to ensure that coaches or other executives were not sexually abusing, exploiting, or trafficking athletes—even though they knew this abuse was occurring.

108.   The USOC did nothing from 2010-2015 to ensure that USA Diving was complying with the Safe Sport program mandated by the USOC.

109.   The USOC identified the need for SafeSport in 2010, but it did nothing to actually operate and enforce the terms of Safe Sport until several years later, as explained below. This delay allowed pedophile coaches to prey on Team USA's vulnerable athletes for several years.

110.   The USOC's U.S. Center for Safe Sport ("SafeSport"), an ostensibly independent entity designed to investigate and report on sexual misconduct, is sponsored by NBC Sports, the National Basketball Association, and the Women's National Basketball Association,[27] which further demonstrates that all aspects of Team USA and the USOC are commercial:



111.   Despite the USOC's knowledge of rampant sexual abuse in its ranks, including in USA Diving, it continues to leave SafeSport radically underfunded and unsupported.

---

[27] *Safesport*, SAFESPORT.ORG, www.safesport.org.

112.    In 2018, the USOC vowed to "double its funding" of SafeSport—but without saying what the original amount being "doubled" even is:

> **How much funding does the USOC dedicate to safe sport?**
>
> Beginning in 2018, the USOC will effectively double its funding for the U.S. Center for SafeSport to enable the hiring of more investigators and staff, improve the timely resolution of cases, enhance ongoing communication for victims and their families, provide age-appropriate training on recognizing and helping to prevent abuse, and offer better and more accessible resources online. [28]

113.    The USOC has admitted that it "has an important responsibility to create positive, safe and secure environments for American athletes."[29]

114.    The USOC has stated that its "top priority is to protect, support and empower every athlete in our community."[30]

115.    At the same time, the USOC has admitted: "We recognize that the system failed too many girls and women, and we have already taken many important steps - including commissioning an independent investigation and demanding a complete leadership and culture change at USA Gymnastics."[31]

116.    Despite creating the SafeSport Initiative in 2012, which it calls the "first-of-its-kind abuse prevention program," it waited two years to even create the U.S. Center for Safe Sport:

> In June 2014, the USOC reaffirmed its commitment to advance the safety and well-being of American athletes by approving the creation of the U.S. Center for SafeSport – an independent entity designed to oversee education programs, and investigate and adjudicate sexual misconduct claims in sports that are managed by USOC-sanctioned NGBs. Participation in the entity – which launched in March 2017 – is a condition of continued membership in the USOC.[32]

---

[28] *Safe Sport*, TEAMUSA.ORG, https://www.teamusa.org/About-the-USOC/Safe-Sport

[29] *Safe Sport*, TEAMUSA.ORG, https://www.teamusa.org/about-the-usoc/safe-sport

[30] Id.

[31] *Id.*

[32] *Id.*

117.    The USOC waited an additional three years to open the Center for Safe Sport in 2017.

118.    As this lawsuit shows, the USOC has done absolutely nothing to stop any of the ongoing sexual abuse of the USA Diving athletes.

119.    This is despicable given the actual knowledge that the USOC admits it had back in 2010:

---

**Why was the U.S. Center for SafeSport originally created?**

In 2010, the USOC determined that sexual and physical abuse warranted greater attention and convened a working group of internal and external experts to provide recommendations about how to improve the community's prevention and response efforts. As the recommendations were implemented, the USOC concluded that the U.S. Olympic and Paralympic movements would benefit from the creation of an independent entity dedicated to investigating and resolving all allegations of sexual abuse associated with any of the USOC's recognized NGBs.[33]

---

120.    In its own words, the USOC has stated that it alone "*is responsible* for the training, entering and funding" of Team USA and all Olympic sports.[34]

121.    In its own words,[35] the USOC has stated:

---

The USOC has two primary responsibilities in its oversight of Olympic and Paralympic sport in the United States. The first is to generate resources in support of its mission, which is to help American athletes achieve sustained competitive excellence. The second is to ensure organizational resources are wisely and effectively used to that end.

---

[33] *Id.*

[34] *About the USOC*, TEAMUSA.ORG, https://www.teamusa.org/About-the-USOC.

[35] *Inside the USOC*, TEAMUSA.ORG, https://www.teamusa.org/About-the-USOC/Inside-the-USOC (emphasis added).

122.   In the wake of the Larry Nassar United States Swimming scandals, Scott Blackmun, on January 24, 2018, then-CEO of the USOC, was forced to write an open letter to the victims of sexual abuse caused by the USOC and the NGBs, and in doing so admitted: "We have said it in other contexts, but we have not been direct enough with you. We are … sorry that you weren't afforded a safe opportunity to pursue your sports dreams. The Olympic family is among those that have failed you."[36]

123.   In this January 24 letter, Mr. Blackmun also stated that the USOC must "**Change the Corporate Structure of the NGB.**"[37]

124.   At the same time they were sexually exploiting and trafficking the very athletes whose labor generated all of the revenue, the Olympic officers made sure to pay themselves exorbitant salaries.

125.   Scott Blackmun paid himself a salary of $1.25 million in 2013.

126.   In 2016, there were 129 USOC employees who were paid more than $100,000.

127.   Scott Blackmun and other USOC employees received thousands of dollars in "per diem" for the numerous days he spent traveling domestically and internationally.

128.   In fact, the former CEO of USA Diving, Linda Paul, made $172,000 in salary and another $26,000 in other compensation in 2016.

129.   USA Diving's "high performance director," Scott Foley, made nearly $140,000 in salary and $26,000 in other compensation in 2016.

130.   Both Foley and Paul received a "per diem" similar to Blackmun.

---

[36] Open Letters to Team USA Athletes Regarding Nasser Case, TEAMUSA.ORG, Jan. 24, 2018, https://www.teamusa.org/News/2018/January/24/Open-Letters-To-Team-USA-Athletes-Regarding-Nassar-Case

[37] *Id.* (emphasis in original).

131.   USOC and NGB employees travel domestically and internationally to do site visits and attend conferences and meetings to award upcoming championships to interested cities and nations.

132.   On these trips, USOC and NGB employees and their elite coaches (like John Wingfield) are fawned over and wooed.

133.   USOC and NGB officials do not want to jeopardize their lavish lifestyles.

134.   These officials did not want to jeopardize their income or the hundred-million-dollar revenues of the USOC and its NGBs (including USA Diving) by stopping the sexual abuse committed by coaches such as Suarez.

135.   To protect children and blow the whistle would have brought negative attention and jeopardized the commercial benefits they were reaping.

136.   The USOC provides funding to each NGB.

137.   For example, the USOC distributed $55.9 million in grants to its NGBs in 2016.[38]

138.   The USOC is the largest single source of funding for USA Diving.

139.   In order for a diver to participate in USA Diving-sanctioned events, it is necessary to be a USA Diving member.

140.   USA Diving is the national governing body for the sport of diving, and, as such, is a member of the USOC.

141.   USA Diving is comprised of subdivisions, known as Associations (LDAs), which are defined as geographical areas.

---

[38] UNITED STATES OLYMPIC COMMITTEE 2016 ANNUAL REPORT, *supra* note 25, at 27; *see also* Eddie Pells, *With USOC in Turmoil, Athletes Testify About Sex-Abuse Cases*, HOUSTON CHRON. (Apr. 18, 2018) (noting that the USOC, embroiled in sex abuse scandals, and with commercial partners hesitant to strike deals under the current climate, doubled its funding for the US Center for SafeSport, which opened in 2017, to $3.1 million in 2018).

142.    Indiana is its own LDA.

143.    The membership of USA Diving consists of Athlete Members, Coach Members, Club Members, and others.

144.    Athletes who seek to become U.S. Olympians in diving must be members of USA Diving.

145.    USA Diving selects divers to compete in the Olympic Games, World Championships, and other competitions.

146.    USA Diving submits the names of its selected athletes to the USOC for approval prior to international competitions, including but not limited to the Olympics.

147.    USA Diving requires its coaches to obtain coaching licenses and credentials.

148.    USA Diving requires its coaches to undergo specific training to become a USA Diving coach.

149.    USA Diving now requires that its coach members undergo Safe Sport training concerning child sexual abuse.

150.    This Safe Sport training was mandated by the USOC for USA Diving.

151.    Since 1999 or before, the USOC has required USA Diving to carry specific insurance for sexual abuse.

152.    Since 1999 or before, USA Diving has maintained liability insurance for the sexual abuse of its members.

153.    USA Diving provides specific sexual molestation insurance to its clubs.

154.    USA Diving provides specific sexual molestation insurance coverage to the Ripfest diving club.

155.    USA Diving provides specific sexual molestation insurance coverage to its

22

coaches.

156.    USA Diving provides or provided specific sexual molestation insurance coverage to Johel Ramirez Suarez.

157.    All Plaintiffs are among the intended beneficiaries of USA Diving sexual abuse insurance.

158.    USA Diving has the exclusive power to expel coach members from USA Diving.

159.    USA Diving began keeping a list of "permanently ineligible members" in 2015.[39]

160.    William Bohonyi was the first coach publicly banned by USA Diving.

161.    SafeSport put Ramirez on this list on January 16, 2018.

162.    USA Diving had received numerous complaints about sexual abuse of minor and young adult athletes prior to 2015.

163.    USA Diving has chosen to not make these complaints public.

164.    Upon information and belief, coaches and officials who were the subject of these complaints are still coaching children in USA Diving.

165.    Today, USA Diving continues to subject its athletes to sexual abuse and predatory behavior by many of its coaches.

166.    USA Diving has not reported any allegations of child sexual abuse committed by its member coaches to law enforcement.

167.    Each USA Diving member, including Plaintiffs herein, had to abide by the rules and regulations of the USOC and USA Diving when competing in USA Diving sanctioned events.

---

[39] *See* U.S. Center for Safe Sport, *Permanently Ineligible Members*,  https://www.teamusa.org/USA-Diving/Resources/Safe-Sport/Permanently-Ineligible-Members (last visited June 28, 2018).

168.     USA Diving members, including Plaintiffs, also had to comply with the drug testing protocols and procedures of the USOC controlled United States Anti-Doping Administration.[40]

169.     To be a USA Diving member, an individual athlete such as the Plaintiffs herein must pay dues to USA Diving.

170.     Part of the dues paid by Plaintiffs went towards the financial grants by Defendants USOC and USA Diving awarded to Wingfield and Suarez and the clubs for which they coached.

171.     Similarly, for a diving club to be considered a USA Diving member club, like Ripfest, the club must pay dues and meet certain minimum standards set out by USA Diving, including purchasing required sexual abuse insurance.

172.     And if the member club seeks to hold a USA Diving sanctioned event at the club, it must pay a fee.

173.     All those who seek to coach, judge, or participate in USA Diving-sanctioned events must also pay a membership fee.

174.     Part of each membership fee is used to purchase specific sexual abuse insurance.

175.     Each NGB is mandated to carry specific sexual abuse insurance coverage by the USOC.

176.     The exchange of money for membership creates a fiduciary relationship and a duty between USA Diving and its members, athletes, and coaches.

177.     Even so, USA Diving took no action to protect its athletes from sexual predators, like William Bohonyi or Johel Ramirez Suarez, who were well known to prey on young athletes.

---

[40] USADA's CEO Travis Tygert and Legal Affairs Director Onye Ikwuakor both litigated against children who were molested in USOC-controlled sports while they worked for Holme Roberts & Owen (now Bryan Cave) in Colorado Springs. Former USOC CEO Scott Blackmun was a partner at Bryan Cave.

178.    In fact, until February of 2015, USA Diving would only consider banning a coach if that coach had been criminally convicted of sexual misconduct, as Suarez was.

179.    SafeSport placed Suarez on the USA Diving banned list two months after his criminal arrest.

180.    Despite having actual knowledge of the need to do so, USA Diving failed to adopt any policies, rules, or procedures to keep athletes safe from sexual abuse.

181.    John Wingfield financially benefitted from Suarez's participation in USA Diving.

182.    John Wingfield was **the** USA Diving Olympic Coach.

183.    John Wingfield has been directly compensated by USA Diving.

184.    USA Diving has regularly promoted and advertised on behalf of John Wingfield and his diving clubs.

185.    Suarez financially benefited from his participation in USA Diving-sanctioned events.

186.    At all relevant times, from 2015 to 2017, Suarez was the agent, servant, and/or employee of Ripfest.

187.    By 2016, Ripfest had received complaints that Suarez was routinely sexually exploiting, assaulting, and raping multiple female athletes that were entrusted into the protection (and bound by the commercial terms of) USA Diving, Ripfest, Indiana Diving Association and John Wingfield.[41]

188.    Ripfest knew or was willfully blind to the fact that the Suarez presented a clear and present danger to young female athletes.

---

[41] For purposes of this Complaint, "rape" means any non-consensual sexual activity, that would be considered criminal, including the sexual touching of minors.

189.    At least one USA Diving employee had knowledge of sexual assaults by Suarez  by late 2016.

190.    At all relevant times, from 2015 to 2017, Suarez was the agent, servant, and/or employee of USA Diving because he coached USA Diving members at USA Diving member clubs and traveled with these teams to USA Diving-sanctioned events.

191.    At all relevant times, from 2015 to 2017, Suarez was cloaked with the actual and apparent authority to represent USA Diving.

192.    By 2016, USA Diving had received complaints that Suarez was routinely sexually exploiting, assaulting, and raping multiple female athletes that were entrusted into the protection (and bound by the commercial terms of) USA Diving.

193.    By late 2016 John Wingfield, IDA and Ripfest were aware that Suarez had assaulted Jane Doe 1.

194.    USA Diving knew or was willfully blind to the fact that the Suarez presented a clear and present danger to young female athletes

### Congress Is Forced to Step In: The Sports Abuse Act 2017

195.    Because the USOC did nothing to stop the sexual abuse and exploitation of Team USA's athletes for so many years, Congress finally intervened in 2017.

196.    The 2017 Sports Abuse Act was overwhelmingly popular and bipartisan.

197.    It sailed through the House (406-3), was approved by the Senate unanimously, was quickly signed by the President, and took effect in February 2018.

198.    At the time, Senator Nelson said: "It's a stain on our country that many of our own young Olympic athletes were sexually abused for years by the very adults they entrusted to train them and keep them safe."

199.     Senator Nelson continued: "No aspiring athlete deserves to have their dream or moment of Olympic gold stolen from them by the actions of a sexual predator. These heinous crimes and the culture that allowed them to go undetected for so long must come to an immediate end."

200.     Senator Donnelly said: "Amateur athletics governing bodies like USA Gymnastics have an obligation to athletes, parents, and the sport to ensure that athletes are safe."[42]

201.     In announcing the 2017 Sports Abuse Act, Senator Collins applauded the multitude of Olympic sex abuse victims who spoke out in the face of retaliation by Team USA, and she criticized the "corrupt system" that had allowed sexual abuse to fester in Team USA sports for decades.[43]

202.     Senator Collins explained that the 2017 Act "reform[s] the law that allows victims to sue sex-crime perpetrators by extending the statute of limitations because it's often difficult for children to recognize that they have had crimes committed against them until much later on into adulthood."[44]

203.     Senator Feinstein (co-author of the law) pointed out that the 2017 Sports Abuse Act "extends the statute of limitations so that victims can sue their abusers 10 years after they become aware of their abuse. This is important because, tragically, survivors often do not fully become aware of their abuse until later in life."[45]

---

[42] Senator Dianne Feinstein, *Senate Passes Bill Requiring U.S. Amateur Athletic Organizations to Report Sexual Abuse*, FEINSTEIN.SENATE.GOV (Nov. 14, 2017), https://www.feinstein.senate.gov/public/index.cfm/press-releases?ID=2BEC8C16-43E4-412A-8660-3E7EC73104F9.

[43] *Id.*

[44] *Id.*

[45] *Id.*

204.     As part of the 2017 Sports Abuse Act, Congress clarified that an Olympic "event" is more than just the moment of competition; Congress defined the term "event" such that it "includes travel, lodging, practice, competition, and health or medical treatment."[46]

205.     With only one or two very specific exceptions not applicable here, every adult in Indiana, the State where USA Diving is headquartered, is a mandatory reporter of child sexual abuse.

206.     Even at this time, USA Diving has not reported Suarez to law enforcement.

**Sexual Abuse, Exploitation, and Forced Labor of Plaintiff Amy Stevens**

207.     In the fall of 2015, while Suarez was coaching at Ripfest, Amy Stevens (Amy) was enticed, recruited, or otherwise induced to move from another state to join the program at Ripfest.

208.     Amy was 16-years-old when she joined Ripfest.

209.     During the winter, Ripfest holds diving practice at local pools, which Ripfest rents from local public school districts.

210.     Ripfest has rented pools from at least North Central High School, Fishers High School, Noblesville High School, and Hamilton Heights High School.

211.     While Amy stretched at Ripfest practices at various pools in Marion and Hamilton Counties, Defendant Suarez would help Amy stretch.

212.     As time progressed, Suarez began moving his hands further down Amy's thighs while helping her stretch.

213.     By the end of 2015, Suarez was placing his hands and fingers over Amy's swimsuit, directly on her vulva.

214.     Suarez inappropriately touched and rubbed Amy's vulva approximately a dozen

---

[46] 34 U.S.C. § 20341(10).

times in 2015 and 2016.

215.    On each of the various occasions of sexual assault, Suarez inappropriately touched and rubbed Amy's vulva for varying amounts of time.

216.    Suarez inappropriately touched and rubbed the vulvae of several teenaged Ripfest athletes while the entire Ripfest coaching staff was present in the pools of various Central Indiana High Schools.

217.    Suarez pled guilty to touching the vulva of another teenage Ripfest diver when he was arrested in Hamilton County in November 2017.[47]

### Sexual Abuse, Exploitation, and Forced Labor of Plaintiff Jane Doe 1

218.    At all relevant times, Plaintiff Jane Doe 1 was an employee of Ripfest.

219.    At all relevant times, Jane Doe 1 was a sanctioned and licensed USA Diving Coach.

220.    Jane Doe 1 lived in the Ripfest dorms in Arcadia, Indiana from July 2016 to June 2017.

221.    While sleeping in her room in the Ripfest dorms in the fall of 2016, Jane Doe 1 awoke to Defendant Suarez attempting to digitally penetrate her.

222.    Jane Doe 1 was able to fight Defendant Suarez off of her.

223.    The next day, Jane Doe 1 told Defendant Wingfield that Defendant Suarez had assaulted her in the Ripfest dorms.

224.    At all relevant times, Defendant Wingfield was Jane Doe 1's direct boss.

225.    Despite his ongoing duty to protect the athletes and coaches alike, Wingfield was dismissive of Jane Doe 1's allegations and took no action.

---

[47] Suarez pled guilty to three counts of battery, *see* 29C01-1711-F5-8587.

**Ripfest and Wingfield's Obstruction, Interference, Dismissal and Facilitation of Abuse**

226.    At all relevant times, Wingfield and Ripfest fostered, permitted and/or ratified a culture that tolerated sexual harassment, objectification, assault, and abuse.

227.    After learning of Jane Doe 1's allegations against Suarez, numerous other Ripfest athletes complained to Defendant Wingfield that Suarez was touching them inappropriately.

228.    On numerous occasions, Amy, Jane Doe 1, other minor Jane Does who were Ripfest athletes[48], and other Ripfest athletes and staff complained to Defendant Wingfield that Suarez was touching them inappropriately.

229.    Defendant Wingfield was dismissive of the complaints of his athletes against Suarez.

230.    In response to athlete complaints against Suarez, Defendant Wingfield told his athletes that Defendant Suarez was "Venezuelan, and that is just how they are."

231.    From late 2016 to his arrest in late 2017, it was an open secret that Suarez was having sexual intercourse with S. Doe,[49] who was then between the ages of 16 and 18.

232.    Although she did not live in Ripfest housing, S. Doe was an athlete in the Ripfest program.

233.    From time to time, various diving programs and individuals attend camps and training sessions at the Ripfest facility in Arcadia, Indiana.

234.    It was an open secret at Ripfest that Suarez had sexual intercourse with at least one underage Venezuelan diver while Suarez coached at Ripfest.

235.    On numerous occasions throughout 2016 and 2017, it was brought to Wingfield's

---

[48] L. Doe is an 18-year-old Ripfest athlete and is one of the victims in the criminal case against Mr. Suarez; L. Doe is <u>not</u> a party to this action at the present time.
[49] S. Doe is not a party to this lawsuit at this time.

attention that Mr. Suarez was being sexually inappropriate with the teenage female athletes at Ripfest.

236.    On numerous occasions, another USA Diving-sanctioned Ripfest coach, Chris Heaton, solicited nude pictures from female athletes at Ripfest.

237.    Heaton sent pictures of his penis to young female athletes.

238.    On numerous occasions beginning in 2015, Amy Stevens and other girls complained about Heaton to Wingfield.

239.    Defendant Wingfield was dismissive of his female athletes' complaints about Heaton.

240.    After Wingfield was dismissive of the complaints against Heaton, his female athletes turned to another Ripfest coach, Chris Zukas, for help.

241.    Plaintiff Amy Stevens and other female divers complained about Heaton to Chris Zukas.

242.    Zukas was also aware that Suarez was having a sexual relationship with S. Doe.

243.    Zukas was employed in the same position at Ripfest as Jane Doe 1.

244.    Zukas was instrumental in getting Heaton to leave Ripfest.

245.    Zukas left Ripfest and began working at USA Diving in October 2016.

246.    Zukas is currently the National Events Manager for USA Diving.

247.    USA Diving is aware of the complaints against Heaton.

248.    Chris Heaton is still a USA Diving coach.

249.    USA Diving hosts events at the club where Heaton is currently coaching.

250.    On numerous occasions, Jane Doe 1 also complained to USA Diving employee Chris Zukas about Defendant Suarez's conduct.

251.    Ripfest also employed one Coach A. Roe.

252.    Coach A. Roe was a coach at Midwestern University who coached at Ripfest during the various camps Ripfest hosts throughout the year.

253.    Coach A. Roe worked at Ripfest camps in 2015, 2016, and 2017.

254.    Numerous female athletes complained to Wingfield and Jane Doe 1 about sexually inappropriate behavior by Coach A. Roe.

255.    Again, Wingfield was dismissive of the complaints against coach A. Roe.

256.    Parents of divers complained about coach A. Roe's sexually inappropriate interactions with teenage female divers.

257.    A. Roe attempted to purchase a plane ticket for one teenage diver to fly from Indianapolis to his hometown to meet him for sex.

258.    Coach A. Roe was terminated from his college coaching position.

259.    Despite his known reputation, Defendant Wingfield wanted to hire Coach A. Roe to continue working at Ripfest camps.

260.    Plaintiff Jane Doe 1 intervened to keep A. Roe from returning to work at Ripfest in the summer of 2017.

261.    In the summer of 2017, Suarez began to stretch another minor diver at Ripfest practices.

262.    As summer turned to fall in 2017, Suarez's hands strayed up her legs.

263.    By the fall of 2017, Defendant Suarez was placing his hands on her vulva.

264.    This diver complained to her teammates at Ripfest.

265.    She complained to Defendant John Wingfield about Suarez touching her inappropriately while stretching.

266.    Defendants Suarez and Wingfield ignored her complaints.

267.    This diver then called her parents, who contacted Hamilton county law enforcement in November 2017.

268.    A member of the media contacted North Central High School and Ripfest prior to Suarez's arrest to inquire about allegations of sexual abuse against Defendant Suarez in November 2017.

269.    Defendant John Wingfield and Defendant Suarez were both approached by administrators at North Central High School.

270.    Defendant Wingfield denied any knowledge of complaints against Defendant Suarez when questioned by North Central High School officials.

271.    Defendant Wingfield took no action against Defendant Suarez after the media inquiry into Defendant Suarez.

272.    Defendant Ramirez Suarez was arrested and charged with 32 felony counts of child sexual abuse on November 29, 2017, in *State of Indiana v. Ramirez Suarez,* 29C01-1711-F5-008587.

273.    Defendant Ramirez Suarez sexually assaulted at least 5 teenage divers while he was a USA Diving certified coach.

274.    Subsequent to his arrest, USA Diving placed Ramirez Suarez on the "permanently ineligible for membership" list.

275.    After Suarez's arrest, USA Diving took no mitigating efforts to ensure his victims and other divers were ok. USA Diving did not seek to get therapy, counseling or any psychological help for the young women that were abused, despite the fact it allowed Suarez access to these women and ignored the complaints of his abuse for months.

33

## CLASS ACTION ALLEGATIONS

276.    Plaintiffs bring this action individually and pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) or (c)(4) on behalf of themselves and the following "Nationwide Classes":

### (b)(2) Injunction Class

All USA Diving members (subject to the USOC's "commercial terms" page or any other contract with the USOC or USA Diving).

### (b)(3) and/or (c)(4) Damage Class

All female USA Diving members (subject to the USA Diving's "commercial terms" page or any other contract) who (1) participated in diving from 2008 to the present, and (2) traveled, trained, or worked with  Johel Ramirez Suarez.

277.    The Classes consist of dozens, if not more, girls and women throughout the U.S., making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are ascertainable through records maintained by USA Diving (and its predecessors), the U.S. Center for Safe Sport, USA Diving member clubs, including Ripfest, and others.

278.    The claims of Plaintiffs are typical of the Classes. The claims of Plaintiffs and the Classes are based on the same legal theories and arise from the same unlawful pattern and practice of sexual abuse, exploitation, and forced labor of female divers and other athletes; the promotion and cover-up of this misconduct; and the commercial benefits Defendants received engaging in this misconduct.

279.    There are many questions of law and fact common to the claims of Plaintiffs and the Classes, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2), (b)(3), and (c)(4).

280.    Common questions of fact or common questions of law affecting members of the Classes include, but are not limited to, the following:

a.   Whether Defendants owed a legal duty to the members of the Class under federal and/or state law?

b.   Whether Defendants' violations of the TVPA were knowing?

c.   Whether the Defendants engaged in forced labor or services?

d.   Whether Suarez engaged in a pattern of sexual abuse and exploitation (sexual and physical misconduct)?

e.   Whether Suarez's pattern of sexual abuse and exploitation was committed within the scope of his commercial arrangements/agency/employment with Ripfest and/or USA Diving?

f.   Whether USA Diving had knowledge of or was willfully blind to Suarez's sexual and physical misconduct?

g.   Whether Ripfest had knowledge of or was willfully blind to Suarez's sexual and physical misconduct?

h.   Whether each Defendant facilitated the sexual misconduct?

i.   Whether each Defendant acted in reckless disregard of the sexual and physical misconduct committed by Suarez?

j.   Whether each Defendant engaged in conduct designed to suppress, cover-up, or "in any way interfere with" complaints or reports regarding the sexual and physical misconduct of Suarez?

k.   Whether any Defendant negligently hired, retained, supervised, certified, or endorsed Suarez?

l.   Whether any Defendant negligently failed to oversee the conduct of its member clubs, and their USA Diving certified coaches, including  Suarez?

281.    Absent a class action, most of the members of the Classes would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, particularly as to liability, in that it conserves the resources of the courts and the litigants and promotes the consistency and efficiency of adjudication.

282.     Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, and who have expertise in prosecuting personal injury, sexual abuse, and civil rights cases on behalf of vulnerable victims.

283.     Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members, and they have the financial resources and experience in handling sex abuse cases to do so.

284.     Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of the Classes.

285.     Plaintiffs and the Class will have personal injury damages that are individualized, but those can be managed separately.

**CLAIMS FOR RELIEF**

286.     The Sports Abuse Act of 2017 specifically amended the civil remedy provision in 18 U.S.C. § 2255, which incorporates the Trafficking Victims Protection Act ("TVPA") and a multitude of criminal sexual abuse statutes.

287.     Section 2255 was enacted to allow minor victims of sex trafficking, forced labor, sexual exploitation, and other crimes, to file a civil lawsuit in federal district court and seek a wide range of remedies. Section 2255 imposes civil liability against those who commit or benefit from the sexual exploitation of minors.

288.     The Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589-96, creates civil liability for those who commit or benefit from forced labor or services or sex trafficking and trafficking-related offenses, including those offenses enumerated in 18 U.S.C. §§ 1589, 1590, and 1591. Violations of the TVPA include: forcing someone into labor or sexual services; knowingly

36

benefitting from such forced labor or services; recruiting or transporting a person for labor or services against their will, especially if those actions include sexual abuse; attempting to commit these trafficking offenses; conspiring to commit these trafficking offenses; obstructing or interfering with efforts to enforce the TVPA; and benefitting financially from these offenses.

289.    The TVPA expressly authorizes civil remedies against both the perpetrator and others who knowingly benefit from violations of the TVPA. *See* 18 U.S.C. § 1595(a).

290.    Each of the Defendants benefitted financially and/or received something of value from the exploitation, forced sexual acts, and forced labor of the Plaintiffs. Under both the TVPA and Section 2255, the Defendants are liable for the following federal causes of action, as well as the state law claims alleged below.

<u>**Counts for Violations of Federal Law – Jane Doe 1**</u>

**COUNT 1**
**Forced Labor in Violation of 18 U.S.C. §§ 1589(b) and 1595(a)**
*By Jane Doe 1 against USA Diving and the Indiana Diving Association*

291.    Jane Doe 1 realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

292.    Jane Doe 1 is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

293.    In violation of 18 U.S.C. §§ 1589 and 1595(a), USA Diving and IDA through their agents, Defendant Johel Ramirez Suarez and John Wingfield, knowingly benefitted from participation in a venture with Johel Ramirez Suarez, Ripfest, and John Wingfield knowing, or in reckless disregard of the fact, that the venture was engaged in the providing or obtaining of Jane Doe 1's labor or services by means of force, threats of force, physical restraint, threats of physical restraint, serious harm or threats of serious harm, and/or a scheme, plan, or pattern intended to

cause Jane Doe 1 to believe that, if that she did not perform such labor or services, she would suffer serious harm or physical restraint.

294.     Defendant USA Diving and IDA also knowingly benefitted from participating in a venture with Defendants Johel Ramirez Suarez, Wingfield, and Ripfest which it knew or should have known were engaging in violations of the TVPA.

295.     USA Diving knew or recklessly disregarded the fact that Johel Ramirez Suarez was attempting to obtain Jane Doe 1's forced labor and sexual services.

296.     Upon information and believe at least one  employee of USA Diving had knowledge that Johel Ramirez Suarez was having sex with a minor athlete.

297.     Upon information and believe at least one  employee of USA Diving had knowledge that Johel Ramirez Suarez had assaulted Jane Doe 1 earlier in 2016.

298.     USA Diving and IDA knowingly or recklessly participated in Johel Ramirez Suarez's scheme to force Jane Doe 1 into forced sexual acts.

299.     In addition, USA Diving and IDA aided and abetted Johel Ramirez Suarez's violations of 18 U.S.C. § 1589(a) by providing knowing and substantial assistance to him when it knew or should have known that Jane Doe 1 was being subjected to forced sexual acts against her will through means of actual force and threats of force, and that she was being abused and raped.

300.     USA Diving benefitted (financially and otherwise) from Johel Ramirez Suarez's actions including by collecting money through sponsorships, licensing, grants, publicity, for medals achieved at competitions, and for his recruitment and training of other competitive divers, despite knowing that Jane Doe 1 had been repeatedly sexually assaulted.

301.     As a direct and proximate result of the actions of the USA Diving and IDA, Jane Doe 1 has suffered personal injuries, including severe emotional distress, physical injuries, and

economic losses, and these injuries continue.

302.     Jane Doe 1 claims damages in an amount to be proven at trial, including attorneys'
fees, injunctive relief, and other relief that the Court may deem proper.

**COUNT 2**
**Trafficking with Respect to Forced Labor in Violation of 18 U.S.C. §§ 1590(a) and 1595(a)**
*By Jane Doe 1 against All Defendants*

303.     Jane Doe 1 realleges and incorporates by reference each and every allegation
contained in the preceding paragraphs as if fully set forth herein.

304.     Jane Doe 1 is authorized to bring this civil claim against Defendants pursuant to
18 U.S.C. § 1595(a).

305.     In violation of 18 U.S.C. §§ 1590(a) and 1595(a), Johel Ramirez Suarez
knowingly recruited, enticed, harbored, transported, and/or obtained Jane Doe 1 for labor or
services.

306.     Johel Ramirez Suarez knowingly recruited and fraudulently enticed Jane Doe 1 to
come to Indiana, with the intention of forcing her into sexual labor and services for him.

307.     Johel Ramirez Suarez knowingly benefitted (financially and otherwise) from his
recruitment, enticement, harboring, transport, and obtaining of Jane Doe 1. He attempted to receive
free sexual services and labor from Jane Doe 1.

308.     John Wingfield and Ripfest, despite knowing of Johel Ramirez Suarez propensity
to sexual assault young women, knowingly recruited and fraudulently enticed Jane Doe 1 to move
to Indiana and to live and work at Ripfest exposing her to the known danger of sexual assault by
Johel Ramirez Suarez.

309.     USA Diving also knowingly benefitted from participating in a venture with Johel
Ramirez Suarez, which it knew or should have known was engaging in violations of the TVPA.

310.    USA Diving and IDA promoted, endorsed, sanctioned, compensated, and legitimized Wingfield as a coach and the diving program at Ripfest.

311.    Upon information and believe at least one  employee of USA Diving had knowledge that Johel Ramirez Suarez was having sex with a minor athlete.

312.    Upon information and believe at least one  employee of USA Diving had knowledge that Johel Ramirez Suarez had assaulted Jane Doe 1 earlier in 2016.

313.    USA Diving and IDA promoted, endorsed, sanctioned, compensated, and legitimized Wingfield and his Ripfest program despite knowing that Johel Ramirez Suarez, Wingfield's assistant, was known to sexually assault young women.

314.    USA Diving and IDA benefitted financially from the camps and residential program that Wingfield ran at Ripfest.

315.    USA Diving and IDA benfiited from Jane Doe 1's labor while working at Ripfest,

316.    USA Diving benefitted (financially and otherwise) from Johel Ramirez Suarez actions including by collecting money through sponsorships, licensing, grants, publicity, and for medals achieved at competitions, and for his recruitment and training of other elite diving athletes, despite knowing that Johel Ramirez Suarez was repeatedly sexually abusing young female members of USA Diving.

317.    As a direct and proximate result of the actions of the Defendants, Jane Doe 1 has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

318.    Jane Doe 1 claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

**Federal Counts for Violations of Federal Law- Amy Stevens**

## COUNT 3
**Forced Labor in Violation of 18 U.S.C. §§ 1589(a), 1595(a), and 2255**
*By Amy Stevens Against Johel Ramirez Suarez*

319.    Amy realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

320.    Amy is authorized to bring this civil claim against Defendants pursuant to the civil remedies provisions of 18 U.S.C. §§ 1595(a) and 2255.

321.    In violation of 18 U.S.C. §§ 1589(a) and 1595(a), Defendant Johel Ramirez Suarez knowingly obtained forced sexual services from Amy by means of serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2), and through a scheme, plan, or pattern, he intended to cause Amy to believe that, if that she did not perform such labor or services, she would suffer serious harm in violation of 18 U.S.C. § 1589(a)(4).

322.    As a direct and proximate result of the actions of the Defendants, Amy has suffered personal injuries, including severe emotional distress, physical injuries, and economic losses, and these injuries continue.

323.    Amy claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 4
**Forced Labor in Violation of 18 U.S.C. §§ 1589(b), 1595(a), and 2255**
*By Amy Stevens Against USA Diving and IDA*

324.    Amy realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

325.    Amy is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. §§ 1595(a) and 2255.

41

326.     In violation of 18 U.S.C. §§ 1589 and 1595(a), USA Diving and IDA, through their agent, Defendant Johel Ramirez Suarez, knowingly benefitted from participation in a venture with Johel Ramirez Suarez, knowing or in reckless disregard of the fact that the venture was engaged in the providing or obtaining of Amy's labor or services by means of force, threats of force, physical restraint, threats of physical restraint, serious harm or threats of serious harm, and/or a scheme, plan, or pattern intended to cause Amy to believe that, if that she did not perform such labor or services, she would suffer serious harm.

327.     Defendants USA Diving and IDA also knowingly benefitted from participating in a venture with Defendant Johel Ramirez Suarez, who they knew or should have known was engaging in violations of the TVPA.

328.     USA Diving and IDA knew or recklessly disregarded the fact that Johel Ramirez Suarez was obtaining Amy's forced labor and sexual services.

329.     USA Diving and IDA, through its agents Wingfield and Ripfest, at times housed (literally)[50] Amy, paid her travel expenses, and observed her performance in competitions.

330.     Defendants Wingfield, Ripfest, USA Diving and IDA knew or should have known the conditions under which Johel Ramirez Suarez was "coaching" Amy because Amy and the other girls who were members of Ripfest openly talked about Suarez's sexual touching, fondling, in and in the case of one minor diver, a full on sexual "relationship" at Ripfest practices.

331.     Upon information and belief, at least one  employee of USA Diving had knowledge that Johel Ramirez Suarez was having sex with a minor athlete.

332.     Upon information and belief, at least one  employee of USA Diving had knowledge that Johel Ramirez Suarez had assaulted Jane Doe 1 earlier in 2016.

---

[50] Amy literally stayed in the "camphouse" owned by John Wingfield in her first summer as a residential diver at Ripfest.

333.     USA Diving and IDA knowingly or recklessly participated in Johel Ramirez Suarez's scheme to force Amy into forced sexual acts.

334.     In addition, USA Diving and IDA aided and abetted Johel Ramirez Suarez's violations of 18 U.S.C. § 1589(a) by providing knowing and substantial assistance to him when it knew or should have known that Amy was being subject to forced sexual acts against her will through means of actual force and threats of force, and that she was being abused.

335.     USA Diving benefitted (financially and otherwise) from Johel Ramirez Suarez's actions including by collecting money through sponsorships, licensing, grants, publicity, for medals achieved at competitions, and for his recruitment and training of other competitive divers, despite knowing that Amy was being repeatedly sexually abused and raped.

336.     As a direct and proximate result of the actions of the Defendants, Amy has suffered personal injuries, including severe emotional distress, physical injuries, and economic losses, and these injuries continue.

337.     Amy claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

### COUNT 5
### Trafficking with Respect to Forced Labor
### in Violation of 18 U.S.C. §§ 1590(a), 1595(a), 2255
*By Amy Stevens Against All Defendants*

338.     Amy realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

339.     Amy is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. §§ 1595(a) and 2255.

340.     In violation of 18 U.S.C. §§ 1590(a) and 1595(a), Ripfest, USA Diving, and IDA, through their agents Johel Ramirez Suarez and John Wingfield, knowingly recruited, enticed,

harbored, transported, and/or obtained Amy's move from Michigan to Indiana for labor or services.

341.    Johel Ramirez Suarez knowingly recruited and fraudulently enticed Amy to come to Indiana, with the intention of forcing her into sexual labor and services for him.

342.    Johel Ramirez Suarez knowingly benefitted (financially and otherwise) from his recruitment, enticement, harboring, transport, and obtaining of Amy. He received free sexual services and labor from Amy.

343.    In violation of 18 U.S.C. §§ 1590(a) and 1595(a), USA Diving, IDA, Ripfest, and Wingfield, through their agent, Johel Ramirez Suarez, knowingly recruited Amy to move to Indiana to train, despite knowing that Suarez had a propensity to assault young females.

344.    USA Diving, IDA, Ripfest, and Wingfield also knowingly benefitted from participating in a venture with Johen Ramirez Suarez, which it knew or should have known was engaging in violations of the TVPA.

345.    In addition, Ripfest, Wingfield, IDA, and USA Diving promoted and directly joined Johel Ramirez Suarez's violations of 18 U.S.C. § 1590(a) by providing knowing and substantial assistance to him when they knew or should have known that Amy had been recruited, transported, or obtained by any means for labor or services.

346.    USA Diving, IDA, Ripfest, and Wingfield benefitted (financially and otherwise) from Johel Ramirez Suarez's actions including by collecting money through rents, camp fees, camp tuition, program memberships, sponsorships, licensing, grants, publicity, and for medals achieved at competitions, and for his recruitment and training of other elite diving athletes, despite knowing that Amy was being repeatedly sexually abused and raped.

347.    As a direct and proximate result of the actions of the Defendants, Amy has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

348.    Amy claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 6
### Obstruction, Attempted Obstruction, Interference with Enforcement in Violation of 18 U.S.C. §§ 1590(b), 1591(d), 1595(a), and 2255
*By Amy Stevens Against John Wingfield, and United States Diving*

349.    Amy realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

350.    Amy is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. §§ 1595(a) and 2255.

351.    Every adult in Indiana is a mandatory reporter of child abuse.

352.    At least one adult employee at USA Diving was aware that Suarez was having illegal sexual contact with minor female members of the Ripfest Diving program.

353.    Prior to Suarez assaulting Amy, John Wingfield knew that Suarez had assaulted Jane Doe 1.

354.    Prior to Suarez assaulting Amy, John Wingfield knew or should have known that Suarez was having illegal sexual contacts with minor female members of Ripfest.

355.    Prior to Suarez assaulting Amy, John Wingfield knew or should have known that Suarez was regularly having illegal sexual contact with minor female athletes who used the Ripfest facilities.

356.    In violation of 18 U.S.C. §§ 1590(b), 1591(d), and 1595(a), Defendants USA Diving and John Wingfield obstructed, attempted to obstruct, interfered, and or prevented the enforcement of these sections by:

a.   ignoring verbal and written complaints of sexual abuse;

b.   dismissing complaints of sexual abuse;

c.   refusing to act on reports of sexual abuse;

d.   threatening athletes with consequences for the abuse that was occurring to them; and

e.   making false statements about athletes.

357.    As a direct and proximate result of the actions of the Defendants, Amy has suffered severe emotional distress, physical injuries, and economic losses.

358.    Amy claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## Counts for Violations of State Common Laws

### COUNT 7
### Battery
*By Jane Doe 1 Against Defendant Ramirez Suarez*

359.    Jane Doe 1 realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

360.    On or about October 2016, Defendant Ramirez Suarez acted with intent to cause harmful or offensive contact with Jane Doe 1.

361.    On or about October 2016, Defendant Ramirez Suarez did cause harmful or offensive contact with Jane Doe 1.

362.    Defendant Ramirez's sexual assault of Jane Doe 1 caused damages to Jane Doe 1.

363.    The amount of those damages shall be determined by a jury.

### COUNT 8
### Battery
*By Amy Stevens Against Defendant Ramirez Suarez*

364.    Amy realleges and incorporates by reference each and every allegation contained

in the preceding paragraphs as if fully set forth herein.

365.    From 2015 through 2017, Defendant Ramirez Suarez acted with intent to cause harmful or offensive contact with Amy Stevens.

366.    Defendant Ramirez Suarez sexually assaulted Amy Stevens, then a minor, approximately twelve to twenty times while Amy Stevens was an athlete at Ripfest.

367.    Defendant Ramirez Suarez's sexual assault of Amy Stevens was harmful and offensive and caused damages to Amy Stevens.

368.    The amount of those damages shall be determined by a jury.

**COUNT 9**
**Negligence**
*By Jane Doe 1 and Amy Stevens against USA Diving and IDA*

369.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

370.    USA Diving certifies, credentials, disciplines, insures, and ultimately has control over its member coaches.

371.    USA Diving has a duty to promulgate policies and procedures to create a safe environment for its athlete members.

372.    USA Diving breached its duties when it failed report complaints of sexual abuse and/or harassment to law enforcement authorities in Indiana.

373.    USA Diving breached its duties when it failed to investigate coaches about whom it had received complaints of sexual misconduct.

374.    USA Diving failed to investigate multiple complaints of sexual misconduct by coaches at Ripfest.

375.    USA Diving failed to investigate multiple complaints of sexual misconduct by

47

athlete members against Defendant Ramirez.

376. USA Diving failed to take any sort of action against Ripfest coaches when it learned that multiple member athletes made allegations against Ripfest coaches, including Ramirez Suarez.

377. USA Diving failed to timely implement the policies and procedures concerning the prevention, reporting, and investigation of athlete sexual abuse mandated by the USOC Safe Sport Program.

378. The Indiana Diving Association is the administrative arm of USA Diving in Indiana.

379. IDA could have taken action against Suarez, instead upon information and belief IDA did nothing to stop Suarez from sexually assaulting young female members of USA Diving in Indiana.

380. Because of multiple breaches by USA Diving, Plaintiffs were individually abused by USA Diving certified member coach Ramirez Suarez.

381. Plaintiffs suffered damages in an amount to be determined by a jury as a result of USA Diving's and IDA's negligence.

## COUNT 10
### Negligence
*By Jane Doe 1 and Amy Stevens against John Wingfield and Ripfest*

382. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

383. Defendants Wingfield and Ripfest employed Defendant Ramirez Suarez.

384. Defendants Wingfield and Ripfest continued to employ Defendant Ramirez Suarez after Jane Doe 1 complained about to Defendant Wingfield that Defendant Ramirez Suarez tried on two occasions to sexual assault her in Ripfest housing.

385.    Defendants Wingfield and Ripfest owe their athletes a duty to maintain a training and competition environment that is reasonably safe.

386.    By ignoring and dismissing Jane Doe 1's complaints of sexual assaults by Defendant Ramirez Suarez, Defendants Wingfield and Ripfest breached their duty to Plaintiffs.

387.    As a result of that breach, Plaintiffs were individually injured in an amount to be determined by a jury.

**COUNT 11**
**Intentional Infliction of Emotional Distress**
*By Jane Doe 1 and Amy Stevens against USA Diving, IDA, Wingfield, and Ripfest*

388.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

389.    By June 2016 at the latest, Defendant Wingfield had actual knowledge that Jane Doe 1 had been assaulted in her room by his employee Ramirez Suarez.

390.    At least one employee of USA Diving had actual knowledge of Suarez's assault of Jane Doe 1 in June 2016.

391.    IDA, which is the administrative arm of USA Diving in Indiana and Ripfest, which is a corporation wholly owned by Wingfield, also both had knowledge of Suarez's June 2016 assault of Jane Doe 1.

392.    After learning of the June 2016 assault of Jane Doe 1, neither Wingfield nor USA Diving took any action against Suarez.

393.    The reckless, intentional inactions of Wingfield and USA Diving allowed Jane Doe 1 to be assaulted again in October 2016 and allowed Amy Stevens to be assaulted.

394.    As a result of Wingfield's and USA Diving's outrageous, reckless, and intentional failures to take action against Suarez, Jane Doe 1 and Amy suffered severe emotional distress.

395.    The amount of Plaintiffs injuries shall be determined at a jury trial.

## COUNT 12
### Negligent Infliction of Emotional Distress
*By Jane Doe 1 and Amy Stevens against USA Diving, IDA, Wingfield, and Ripfest*

396.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

397.    Wingfield and USA Diving each owed Amy and Jane Doe 1 a duty to provide a safe environment to coach and participate in the sport of diving.

398.    Wingfield and USA Diving breached this duty when they failed to take action against Suarez when they learned of his June 2016 assault of Jane Doe 1.

399.    Wingfield and USA Diving's breach caused Jane Doe 1 and Amy to be physically assaulted by Suarez after June 2016.

400.    Those subsequent assaults led to Jane Doe 1 and Amy suffering emotional and physical injuries.

401.    Plaintiffs suffered damages in an amount to be determined by a jury as a result.

## DEMAND FOR JURY TRIAL

Plaintiffs are entitled to and hereby demand a jury trial in this matter.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court will:

a.    Enter judgment against Defendants, jointly and severally, in such amounts as will fully and adequately compensate Plaintiffs for the damages they have suffered, in an amount to be determined at trial;

b.    Award Plaintiffs punitive damages against Defendants, jointly and severally, in an amount to be determined by the jury for Defendants' violations of federal law;

c.      Award Plaintiffs pre-judgment and post-judgment interest;

d.      Award Plaintiffs their actual expenses of litigation, including reasonable

attorney's fees;

e.      Award Plaintiffs injunctive relief that requires the USA Diving to put in

place (and fund) supervision and compliance protocols that actually prevent, uncover, and

stop the sexual abuse, exploitation, and trafficking of USA Diving athletes;

f.      Appoint Plaintiffs as class representatives;

g.      Appoint Plaintiffs' counsel as counsel for the class;

h.      Award Plaintiffs such other and further relief as the Court deems just and

proper.

Date: September 30, 2018                    Respectfully submitted:

                                           s/ Jonathan Little
                                           Jonathan Little, No. 27421-49
                                           Jessica Wegg, No.28693-49
                                           Saeed and Little, LLP
                                           1433 N. Meridian Street
                                           Indianapolis, IN 46202
                                           317-721-9214
                                           jon@sllawfirm.com
                                           jessica@sllawfirm.com

                                           Rex A. Sharp
                                           Ryan C. Hudson, *pro hac vice forthcoming*
                                           Larkin E. Walsh, *pro hac vice forthcoming*
                                           Scott B. Goodger, *pro hoc vice forthcoming*
                                           Sarah T. Bradshaw, *pro hac vice* forthcoming
                                           Sharp Law | Rex A. Sharp, P.A.
                                           5301 W. 75th St.
                                           Prairie Village, KS 66208
                                           913.901.0505
                                           913.901.0419 (fax)
                                           rsharp@midwest-law.com
                                           rhudson@midwest-law.com
                                           lwalsh@midwest-law.com
                                           sgoodger@midwest-law.com